# EXHIBIT 1

# EXHIBIT 1

DOUGLAS F. BEHM - 014727
14362 N Frank Lloyd Wright Blvd, #1000
Scottsdale, AZ 85260
Telephone: (480) 477-6700
dbehm@behmlaw.com

PAT LUNDVALL (NSBN 3761)
KRISTEN T. GALLAGHER (NSBN 9561)
AMANDA M. PERACH (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
plundvall@mcdonaldcarano.com
kgallagher@mcdonaldcarano.com
aperach@mcdonaldcarano.com
(admitted *pro hac vice* to be submitted)
*Attorneys for Plaintiffs*

**IN THE** ~~SUPERIOR~~UNITED STATES DISTRICT **COURT** ~~OF~~

**FOR** **THE** ~~STATE~~DISTRICT **OF ARIZONA**

~~IN AND FOR THE COUNTY OF MARICOPA~~

| | |
|---|---|
| ~~EMERGENCY GROUP OF ARIZONA PROFESSIONAL CORP~~Emergency Group of Arizona Professional Corp, an Arizona ~~professional corporation; EMERGENCY PHYSICIANS SOUTHWEST, P.C., an Arizona professional corporation; QUANTUM HEALTHCARE MEDICAL ASSOCIATES OF ARIZONA~~Professional Corporation; Emergency Physicians Southwest, P.C., an Arizona ~~professional corporation; CHASE DENNIS EMERGENCY MEDICAL GROUP, INC~~Professional Corporation; Chase Dennis Emergency Medical Group, Inc., a California ~~corporation~~Corporation, | ~~No.~~ <br><br> Case No.: 2:19-cv-04687-JJT |
| Plaintiffs, | **FIRST AMENDED** **COMPLAINT** ~~Commercial Court Requested~~ |
| vs. | **Jury Trial Demanded** |
| ~~UNITED HEALTHCARE, INC~~UnitedHealth Group, Inc., a Delaware corporation~~;~~ ~~UNITEDHEALTHCARE OF ARIZONA, INC~~, United Healthcare, Inc., a Delaware Corporation; | |

McDONALD ♦ CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  UnitedHealthcare of Arizona, Inc., an
2  Arizona corporation; UNITED HEALTH CARE SERVICES INC., a Corporation;
3  United Health Care Services Inc., a Minnesota corporationCorporation; UMR,
4  INC., a Delaware corporation; UNITED HEALTHCARE SOLUTIONS, LLC, an
5  Arizona limited liability company; UNITEDHEALTHCARE INTEGRATED
6  SERVICES, INC.,Inc., a Delaware Corporation; UnitedHealthcare Integrated
7  Services, Inc., an Arizona corporation; UNITEDHEALTHCARE SPECIALTY
8  BENEFITSCorporation; UnitedHealthcare Specialty Benefits,
9  LLC, a Maine limited liability company; JOHN DOESLimited Liability Company;
10  John Does 1-10; ROE ENTITIESRoe Entities 11-20,
11

              Defendants.

12
13  Plaintiffs Emergency Group of Arizona Professional Corp; Emergency Physicians
14  Southwest, P.C.; Quantum Healthcare Medical Associates of Arizona, P.C.; and Chase
15  Dennis Emergency Medical Group, Inc. (collectively, the "Providers"), as and for their
16  First Amended Complaint against defendants UnitedHealth Group, Inc. ("UHG"); United
17  Healthcare Insurance Company ("UHIC, Inc. ("UHI"); UnitedHealthcare of Arizona, Inc.
18  ("UHC Arizona"); United Health Care Services Inc. ("UHC Services"); UMR, Inc.
19  ("UMR"); United Healthcare Solutions, LLC ("UHC Solutions"); UnitedHealthcare
20  Integrated Services, Inc. ("UHC Integrated Services"); UnitedHealthcare Specialty
21  Benefits, LLC ("UHC Specialty Benefits") (collectively "United HealthCare") hereby
22  complains and allegesDefendants") assert as follows:[1]

23
24  [1]  Providers file this First Amended Complaint to, among other things, address concerns
25  expressed by Defendants' counsel during the required meet and confer regarding motions
    to dismiss and to assert additional Arizona state law claim.  See ECF No. 6; LRCiv
    12.1(c).  The filing of the First Amended Complaint addresses Defendants' request for
26  additional information to better identify the state law claims at issue in this litigation.
27  Without waiving the position that Defendants' removal was improper and the Court lacks
    subject matter jurisdiction (see Motion to Remand, ECF No. 8) and the case should be
28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## NATURE OF THIS ACTION

1.     Providers are professional emergency medicine service groups that staff emergency departments at hospitals located throughout Arizona.  Providers Treat Patients 24 hours per day, 7 days a week.  In fact, Providers are obligated pursuant to Arizona and Federal law to examine and provide stabilizing care to any individual with an emergency medical condition without regard to the individual's ability to pay or availability of insurance coverage.  This action arises out of a dispute concerning the rate of payment at which ~~United HealthCare reimburses~~Defendants reimburse Providers for the emergency medicine services ~~they~~Providers have already provided, and continue to provide, to ~~patients~~Patients covered under the health plans underwritten, operated, and/or administered by ~~United HealthCare~~Defendants (the "Health Plans") (Health Plan beneficiaries for whom Providers performed covered services ~~that were not reimbursed correctly~~ shall be referred to as "Patients").[1]  Collectively Defendants have manipulated, are continuing to manipulate, and have conspired to manipulate their third parties payment rates to defraud Providers, to deny them reasonable payment for their services which the law requires, and to coerce or extort Providers into contracts that only provide for manipulated rates.  Defendants have reaped millions of dollars from their illegal, coercive, fraudulent conducts and will reap millions more if their conduct is not stopped.

2.     Providers do not assert any causes of action with respect to any Patient whose health insurance was issued under Medicare Part C (Medicare Advantage) or is provided under the Federal Employee Health Benefits Act (FEHBA).  Providers also do not assert any claims relating to Defendants' managed Medicaid business or with respect to the right to payment under any ERISA plan.  Finally, Providers do not assert claims that are dependent on the existence of an assignment of benefits ("AOB") from any of

---

stayed until the Court has an opportunity to adjudicate the Motion to Remand, Providers file this amended pleading and anticipate producing a list of claims at issue in the litigation in conformity with the Court's July 18, 2019 Order (ECF No. 12).

Defendants' Members.  There is – and was -- no basis to remove this lawsuit to federal court under federal question jurisdiction.

## PARTIES

2.3.    Plaintiff Emergency Group of Arizona Professional Corp ("Emergency Group AZ") is a professional emergency medicine services group practice that staffs the emergency departments at Abrazo Arizona Heart Hospital, Abrazo Arrowhead Campus, Abrazo Buckeye Emergency Center, Abrazo Peoria Emergency Center, Abrazo Scottsdale Campus, Abrazo West Campus, and Arizona Central Campus throughout Maricopa County, Arizona.

3.4.    Plaintiff Emergency Physicians Southwest, P.C. ("Emergency Physicians SW") is a professional emergency medicine services group practice that staffs the emergency departments at Banner Baywood Medical Center, Banner Mesa Medical Center, Banner Casa Grande Medical Center, Banner Page Medical Center, and Banner Payson Regional Medical Center, and Banner Page Medical Center throughout Maricopa, Pinal, Coconino and Gila Counties, Arizona.

4.    Plaintiff Quantum Healthcare Medical Associates of Arizona, P.C. ("Quantum") is a professional emergency medicine services group practice that staffs the emergency department at Banner Baywood Medical Center in Maricopa County, Arizona.

5.    Plaintiff Chase Dennis Emergency Medical Group, Inc. ("Chase Dennis") is a professional emergency medicine services group practice that staffsstaffs the emergency departments at Carondelet Holy Cross Hospital and Abrazo Maryvale Campus in Maricopa and Santa Cruz Counties, Arizona.

6.    Defendant UnitedHealth Group, Inc. ("UHG") is the largest single health carrier in the United States and is a Delaware corporation with its principal place of business in Minnesota.  UHG is a publicly-traded holding company that is dependent upon monies (including dividends and administrative expense reimbursements) from its subsidiaries and affiliates which include all of the other Defendant entities named herein.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

6.7.    Defendant United HealthCare, Inc. ("UHC") is a Delaware corporation with its principal place of business in Minnesota.  UHC is responsible for administering and/or paying for certain emergency medical services at issue in the litigation..  It is a subsidiary of Defendant United HealthCare Insurance Company is a licensed ArizonaHealthcare Services, Inc., and provides administrative services to certain health insurance company.plans.

7.8.    Defendant UnitedHealthcare of Arizona, Inc. ("UHC Arizona") is an Arizona corporation and affiliate of UHC.  UHC Arizona is responsible for administering and/or paying for certain emergency medical services at issue in the litigation.  United HealthCare Insurance CompanyUHC Arizona is a licensed Arizona health care services organization.

8.9.    Defendant United HealthCare Services, Inc. ("UHC Services") is a Minnesota corporation with its principal place of business in Minnesota and affiliate of UHC.  UHC Services is responsible for administering and/or paying for certain emergency medical services at issue in the litigation.  United HealthCare Services, Inc. is a licensed Arizona life and health insurance company..

9.10.    Defendant UMR, Inc. ("UMR") is a Delaware corporation with its principal place of business in Minnesota and affiliate of UHC.  UMR is responsible for administering and/or paying for certain emergency medical services at issue in the litigation.  UMR is a licensed Arizona life and health administrator.

10.    Defendant United Healthcare Solutions, LLC ("UHC Solutions") is an Arizona limited liability company and affiliate of UHC.  UHC Solutions is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. UHC Specialty Benefits is a licensed Arizona health care services organization.

11.    Defendant UnitedHealthcare Integrated Services, Inc. ("UHC Integrated Services") is an Arizona corporation and affiliate of UHC.  UHC Integrated Services is responsible for administering and/or paying for certain emergency medical services at

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

issue in the litigation. UHC Integrated Services is a licensed Arizona health insurance company..

12. Defendant UnitedHealthcare Specialty Benefits, LLC ("UHC Specialty Benefits") is a Maine limited liability company and affiliate of UHC. UHC Specialty Benefits is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. UHC Specialty Benefits is a licensed Arizona life and health administrator.

13. There may be other persons or entities, whether individuals, corporations, associations, or otherwise, who are or may be legally responsible for the acts, omissions, circumstances, happenings, and/or the damages or other relief requested by this Complaint. The true names and capacities of John Does 1-10 and Roe Entities 11-20 are currently unknown to Providers, who suessue those defendants by such fictitious names. Providers will seek leave of this Court to amend this First Amended Complaint to insert the proper names of the defendant Does and Roe Entities when such names and capacities become known to them.

## JURISDICTION AND VENUE

14. The amount in controversy exceeds the sum of $300,000, exclusive of interest, attorneys' fees and costs, and the. This action will have voluminous documentary evidence and a large number of fact witnesses.

15. This courtThe Superior Court, Maricopa County, Arizona has subject matter jurisdiction over the matters alleged herein.

16.15. This court has personal since only state law claims have been asserted and no diversity of citizenship exists. Providers contest this Court's subject matter jurisdiction over the defendants, a majority of matters alleged herein and have moved to remand to the transactions upon which the action isSuperior Court, Maricopa County, Arizona. *See* Motion to Remand (ECF No. 8). Providers do not waive their continued objection to Defendants' removal based occurred in Maricopa County, and venueon

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

alleged preemption under the Employers' Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Venue is proper in Maricopa County, Arizona.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *The Providers Deliver Necessary Emergency Care*

17. This is an action for damages stemming from United HealthCare's failure ***to*** properly reimburse Providers for emergency services provided to members of the Health Plans.

### *Patients*

~~18.~~16. Providers are professional practice groups of emergency medicine physicians and healthcare providers that ~~provides~~provide emergency medicine services 24 hours per day, 7 days per week to ~~patients~~Patients presenting to the emergency departments at hospitals and other facilities in Arizona staffed by the Providers.  Providers ~~provides~~Emergency Group AZ and Emergency Physicians SW currently provide emergency department services at ~~16~~12 hospitals located in Maricopa, Pinal, Coconino, Gila, and Santa Cruz Counties, Arizona.  Provider Chase Dennis provided emergency department services at 2 hospitals in Santa Cruz and Maricopa Counties, Arizona.

~~19.~~17. Providers, and the hospitals whose emergency departments they ~~staffs~~staff, are obligated by both federal and Arizona law to examine any individual visiting the emergency department and to provide stabilizing treatment to any such individual with an emergency medical condition, regardless of the individual's insurance coverage or ability to pay.  *See* Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; A.R.S. § 20-2803.  Providers fulfill this obligation for the hospitals which they staff.  In this role, Providers' physicians provide emergency medicine services to all ~~patients~~individuals, regardless of insurance coverage or ability to pay, including to ~~patients~~Patients with insurance coverage issued, administered and/or underwritten by ~~United HealthCare~~Defendants.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

20.18. Upon information and belief, ~~United HealthCare operates~~Defendants operate as health care services organizations under A.R.S. § 20-1051 *et seq.* and administrators under A.R.S. § 20-485 *et seq.* ~~United HealthCare provides, either directly or through arrangements with providers such as hospitals and Providers, healthcare benefits to its members.~~

21.19. There is no written agreement between ~~United HealthCare~~Defendants and Providers for the healthcare claims at issue in this litigation~~:~~. Providers are therefore designated as "non-participating" or "out-of-network" providers for all of the claims at issue ~~in this litigation. Notwithstanding the lack of a written agreement, an~~. An implied-in-fact agreement exists between ~~the parties.~~Providers and Defendants, however.

20. Because federal and state law requires that emergency services be provided to individuals by Providers without regard to insurance status or ability to pay, the law protects emergency service providers -- like Providers here -- from predatory conduct by payors, including the kind of conduct that Defendants have practiced leading to this dispute. If the law did not do so, emergency service providers would be at the mercy of such payors. Providers would be forced to accept payment at any rate or no rate at all dictated by insurers under threat of receiving no payment, and then Providers would be forced to transfer the financial burden of care in whole or in part onto Patients. Providers are protected by law, which requires that for the claims at issue, the insurer must reimburse Providers at a reasonable rate or the usual and customary rate for services they provide.

21. Providers regularly provide emergency services to ~~United HealthCare's~~Defendants' Patients.

22. Defendants are contractually and legally responsible for ensuring that Patients receive emergency services without obtaining prior approval and without regard to the "in network" or "out-of-network" status of the emergency services provider.

23. The uhc.com website, expressly states:

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

22.There are no prior authorization requirements for emergency services in a true emergency, even if the emergency services are provided by an out-of-network provider. Payment for the emergency service will follow the plan rules for network emergency coverage. This provision applies to all non-grandfathered fully insured and self-funded group plan members. plans [Fully Funded plans], as well as group and individual health insurance issuers [Employer Funded plans]. Relevant to this action,

23.24. Providers have provided emergency medicine services to United HealthCare's membersDefendants' Patients on an out-of-network basis as follows:

a.    Emergency Group AZ: Since February 1, 2013 at the emergency departments at Abrazo Arizona Heart Hospital, Abrazo Arrowhead Campus, Abrazo Buckeye Emergency Center, Abrazo Peoria Emergency Center, Abrazo Scottsdale Campus, Abrazo West Campus, and Arizona Central Campus;

b.    Emergency Physicians SW: fromFrom April 1, 2019 through the present and ongoing at the emergency departments at Banner Baywood Medical Center, Banner Mesa Medical Center, Banner Casa Grande Medical Center, Banner Page Medical Center, and Banner Payson Regional Medical Center, and Banner Page Medical Center throughout Maricopa, Pinal, Coconino and Gila Counties, Arizona;

c.b.    Quantum: Since January 17, 2011 at the emergency department at Banner Baywood Medical Center; and

d.c.    Chase Dennis: Between February 1, 1997 and December 31, 2016, at the emergency department at Carondelet Holy Cross Hospital; and between August 1, 2006 and December 17, 2017 through the present and ongoing at the emergency department at Abrazo Maryvale Campus.

25.    RelevantDefendants have generally adjudicated and paid claims with dates of service through April 30, 2019.  As the claims continue to accrue, so do Providers' damages.  For each of the claims for which Providers seek damages, Defendants have already determined the claim was covered and payable.

*The Relationship Between Plaintiffs and Defendants*

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

26.    Defendants provide health insurance to their members (*i.e.*, their insureds).

27.    In exchange for premiums, fees, and/or other compensation, Defendants assume responsibility for paying for health care services rendered to members covered by their health plans.

28.    In addition, Defendants provide services such as building participating provider networks and negotiating rates with providers who join their networks.

29.    Defendants offer a range of health insurance plans. Plans generally fall into one of two categories.

30.    "Fully Funded" plans are plans in which Defendants collect premiums directly from their members (or from third parties on behalf of their members) and pay claims directly from the pool of funds created by those premiums.

31.    "Employer Funded" plans are plans in which Defendants provide administrative services to their employer clients, including processing, analysis, approval, and payment of health care claims, using the funds of the claimant's employer.

32.    Defendants provide coverage for emergency medical services under both types of plans.

33.    They are contractually and legally responsible for ensuring that their members can receive such services (a) without obtaining prior approval and (b) without regard to the "in network" or "out-of-network" status of the emergency services provider.

34.    Defendants highlight such coverage in marketing their insurance products, inducing members to purchase their products and rely upon those representations.

35.    For example, on the "patient protections" section of the UnitedHealthcare website, uhc.com, Defendants state:

There are no prior authorization requirements for emergency services in a true emergency, even if the emergency services are provided by an out-of-network provider. Payment for the emergency service will follow the plan rules for network emergency coverage. This provision applies to all non-grandfathered fully insured and self-funded group health plans [Fully Funded plans], as well as group and individual health insurance issuers [Employer Funded plans].

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

36.    Payors typically demand a lower payment rate from contracted participating providers.

37.    In return, they offer participating providers certainty and timeliness of payment, access to the payor's formal appeals and dispute resolution processes, and other benefits.

38.    For all claims at issue in this lawsuit, Plaintiffs were non-participating providers, meaning they did not have an express contract with Defendants to accept or be bound by Defendants' reimbursement policies or in-network rates.

39.    Specifically, the reimbursement claims within the scope of this action, United HealthCare are (a) non-participating commercial claims (including for patients covered by Affordable Care Act Exchange products), (b) that were adjudicated as covered, and allowed as payable by Defendants, (c) at rates below the billed charges and a reasonable payment for the services rendered, (d) as measured by the community where they were performed and by the person who provided them. These claims are collectively referred to herein as the "Non-Participating Claims."

40.    The Non-Participating Claims involve only commercial and Exchange Products operated, insured, or administered by the insurance company Defendants. They do not involve Medicare Advantage or Medicaid products.

41.    Further, the Non-Participating Claims at issue under Counts III, IV, and V do not involve coverage determinations under any health plan that may be subject to the federal Employee Retirement Income Security Act of 1974, or claims for benefits based on assignment of benefits.[2]

42.    Those counts concern the *rate* of payment to which Plaintiffs are entitled, not whether a *right* to receive payment exists.

---

[2] Plaintiffs understand, in any event, that Defendants do not require or rely upon assignments from their members in order to pay claims for services provided by Plaintiffs to their members.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

43.    Defendants bear responsibility for paying for emergency medical care provided to their members regardless of whether the treating physician is an in-network or out-of-network provider.

44.    Defendants understand and expressly acknowledge that their members will seek emergency treatment from non-participating providers and that Defendants are obligated to pay for those services.

***The Reasonable Rate for Non-Participating Emergency Services is Well-Established***

45.    For many years, Defendants have allowed payment at 75-90% of billed charges for Plaintiffs' emergency services.

46.    Defendants have done so largely through the use of rental networks, which establish a reasonable rate for provider services through arms-length negotiations between the rental network and providers on the one hand, and the rental network and health insurance companies on the other.

47.    Rental networks act as "brokers" between non-participating providers and health insurance companies.

48.    A rental network will secure a contract with a provider to discount its out-of-network charges.

49.    The rental network then contracts with (or "rents" its network to) health insurance companies to allow the insurer access to the rental network and to the providers' agreed-upon discounted rates.

50.    As such, rental networks' negotiated rates act as a proxy for a reasonable rate of reimbursement for out-of-network emergency services, both in the industry as a whole and for particular payors.

51.    For many years, Plaintiffs' contracts with a range of rental networks, including MultiPlan, have contemplated a modest discount from Plaintiffs' billed charges for claims adjudicated through the rental network agreement.

52.    In practice, nearly all of Plaintiffs' non-participating provider claims submitted under Employer Funded plans from 2008 to 2018 were paid at between 75-90% of billed charges, including the Non-Participating Claims submitted to Defendants.

53.    This longstanding history establishes that a reasonable reimbursement rate for Plaintiffs' Non-Participating Claims for emergency services is 75-90% of Plaintiffs' billed charge.

54.    Beginning in January 2019, Defendants have slashed their reimbursement rate for Non-Participating Claims to less than half the average reasonable reimbursement rate.

55.    Defendants' drastic payment cuts are entirely inconsistent with the established rate and history between the parties.

*Defendants Paid Providers Unreasonable Rates*

24.56. Defendants arbitrarily began manipulating the rate of payment for claims submitted by Providers.  Defendants drastically reducingreduced the rates at which they paid Providers for emergency services for some claims, but not others.  United HealthCareInstead of paying a usual and customary rate of the charges billed by Providers, Defendants paid some of the claims for emergency services rendered by Providers at far below the usual and customary rates, yet.  Yet, Defendants paid other substantially identical claims (e.g. claims billed with the same Current Procedural Terminology (CPT) Code, as maintained by American Medical Association) submitted by Providers at higher rates and in some instances at 100% of the billed charge.

a.    For example, on April 28, 2019, Defendants' Member #1,[3] presented to the emergency department at Abrazo Arizona Heart Hospital and was treated by Provider Emergency Group AZ.  The professional services were billed with CPT Code 99285 (the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function) in the amount $1,809.00; Defendants paid $435.20, which is just 24% of the charges billed.  By contrast, on April 26, 2019, Defendants' member #2 presented to the emergency department at Abrazo Scottsdale Campus and was treated by Provider Emergency Group AZ.  The professional services were billed with

---

[3]  To protect identity and personal health information, Providers have assigned numbers to each individual identified.  Upon request, Providers will provide Defendants with additional identifying information for the examples provided.

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

CPT Code 99285 in the amount $1,809.00; Defendants paid $1,809.00, 100% of the charges billed.

　　　　b.　　By way of further example, between February 3 and April 26, 2019, Defendants' Members #3, #4, #5 and #6 all presented to emergency departments staffed by Provider Emergency Group AZ.  In each instance the professional services were billed with CPT Code 99285 and Defendants paid 100% of the billed charges.  By contrast, on February 3 and 4, 2019, Defendants' Members #7, #8 and #9 all presented to emergency departments staffed by Provider Emergency Group AZ.  In each instance, the professional services were billed with CPT Code 99285 and Defendants only paid 40% of the billed charges.

　　57.　　Each Provider's claims are identified more specifically as follows:

　　　　c.　　Emergency Group AZ:

　　　　　　i.　　Dates of service: January 1, 2016 to April 30, 2019 (and ongoing).

　　　　　　ii.　　Litigation claims: approximately 6,986 claims.

　　　　　　iii.　　Providers seek payment for all claims paid at less than 75% of billed charges.

　　　　d.　　Emergency Physicians SW:

　　　　　　i.　　Dates of service: April 1 to April 30, 2019 (and ongoing).

　　　　　　ii.　　Litigation claims: approximately 729 claims.

　　　　　　iii.　　Providers seek payment for all claims paid at less than 75% of billed charges.

　　　　e.　　Chase Dennis:

　　　　　　i.　　Dates of service: January 6, 2016 to December 14, 2017.

　　　　　　ii.　　Litigation claims: approximately 155 claims.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

iii.    Providers seek payment for all claims paid at less than 75% of billed charges.[4]

f.    Providers do not assert any of the foregoing claims pursuant to, or in reliance on, any assignment of benefit by Defendants' Members.  Upon information and belief, among other things, United HealthCareDefendants do not require or rely upon assignment of benefits from their Members in order to pay claims for services provided by Providers.

25.58. Defendants generally payspaid lower reimbursement rates for services provided to membersMembers of their fully insured plans and authorize payment at higher reimbursement rates for services provided to membersMembers of self-insuredemployer funded plans or those plans under which they provide administrator services only.

*United HealthCare Has Underpaid the Providers for Emergency Services*

26.59. Despite not participating in United HealthCare's "provider network" for the times identified herein, Providers have continued to provide emergency medicine treatment, as required by law, to patientsPatients covered by United HealthCare's plansDefendants plan who seek care at the emergency departments where they provide coverage.

60.    Defendants bear responsibility for paying for emergency medical care provided to their Members regardless of whether the treating physician is an in-network or out-of-network provider.

61.    Defendants expressly acknowledges that their Members will seek emergency treatment from non-participating providers and that they are obligated to pay for those services.

---

[4] None of these examples include any claims that were denied in whole by any of the Defendants, or any individual evaluation and management (E/M) code that was denied as part of a claim for which Defendants otherwise deemed eligible for payment.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

27.62. In emergency situations, ~~patients are likely to~~individuals go to the nearest hospital for care, particularly if they are transported by ambulance.  Patients facing an emergency situation are unlikely to have the opportunity to determine in advance which hospitals and physicians are in-network under their health plan.  ~~United HealthCare is~~Defendants are obligated to reimburse Providers at the usual and customary rate for emergency services Providers provided to ~~its~~their Patients, or alternatively for the reasonable value of the services provided.

28.63. ~~United HealthCare's members have~~Defendants' Members received a wide variety of emergency services (in some instances, life-saving services) from Providers' physicians: treatment of conditions ranging from cardiac arrest, to broken limbs, to burns, to diabetic ketoacidosis and shock, to gastric and/or obstetrical distress.

29.64. From ~~July 2017~~January 2016 to the present, Providers provided treatment for emergency services to thousands of Patients who were ~~members~~Members in ~~United HealthCare's~~Defendants' Health Plans.  The total underpayment amount for these related claims is in excess of $300,000.00 and continues to grow.  ~~United HealthCare has~~Defendants have likewise failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of these claims.

30.65.  ~~While the Providers were out-of-network, United HealthCare~~ Defendants paid some claims at an appropriate rate and others at a significantly reduced rate which is demonstrative of an arbitrary and selective program and motive or intent to unjustifiably reduce the overall amount ~~United Healthcare pays~~Defendants pay to Providers.  ~~Upon information and belief, United Healthcare has~~Defendants implemented this program to coerce, influence and leverage business discussions ~~regarding the potential for~~with Providers to become participating providers~~—~~ at significantly reduced rates, as well as to unfairly and illegally profit from a manipulation of payment rates.

31.  ~~For each of the healthcare claims at issue in this litigation, United HealthCare determined the claim was payable; however, it paid the claim at an artificially~~

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  reduced rate.  Thus, the claims at issue involve no questions of whether the claim is

2  payable; rather, they involve only a determination of whether United HealthCare paid the

3  claim at the required usual and customary rate, which it did not.  Thus, there is no basis

4  to remove this action to federal court on the basis of complete preemption under ERISA.

5      32.66. United HealthCare hasDefendants failed to attempt in good faith to

6  effectuate a prompt, fair, and equitable settlement of the subject claims as legally required.

7      33.   Providers bring this action to compel United HealthCare to pay it the usual

8  and customary rate or alternatively for the reasonable value of the professional emergency

9  medical services for the for the emergency services that it provided and will continue to

10  provide Members.

11      34.67. Providers have adequately contested the unsatisfactory rate of payment

12  received from United HealthCareDefendants in connection with the claims that are the

13  subject of this action.

14      35.68. All conditions precedent to the institution and maintenance of this action

15  have been performed, waived, or otherwise satisfied.

16      69.   Providers bring this action to compel Defendants to pay it the usual and

17  customary rate or alternatively for the reasonable value of the professional emergency

18  medical services for the emergency services that it provided and will continue to provide

19  Patients and to stop Defendants from profiting from their manipulation of payment rate

20  data.

21      ***Defendants' Prior Manipulation of Reimbursement Rates***

22      70.   Defendants have a history of manipulating their reimbursement rates for

23  non-participating providers to maximize their own profits at the expense of others,

24  including their own Members.

25      71.   In 2009, defendant UnitedHealth Group, Inc., was investigated by the New

26  York Attorney General for allegedly using its wholly-owned subsidiary, Ingenix, to

27  illegally manipulate reimbursements to non-participating providers.

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

72.    The investigation revealed that Ingenix maintained a database of health care billing information that intentionally skewed reimbursement rates downward through faulty data collection, poor pooling procedures, and lack of audits.

73.    Defendant UnitedHealth Group, Inc. ultimately paid a $50 million settlement to fund an independent nonprofit organization known as FAIR Health to operate a new database to serve as a transparent reimbursement benchmark.

74.    In a press release announcing the settlement, the New York Attorney General noted that: "For the past ten years, American patients have suffered from unfair reimbursements for critical medical services due to a conflict-ridden system that has been owned, operated, and manipulated by the health insurance industry."

75.    Also in 2009, for the same conduct, defendants United HealthGroup, Inc., United HealthCare Insurance Co., and United HealthCare Services, Inc. paid $350 million to settle class action claims alleging that they underpaid non-participating providers for services in *The American Medical Association, et al. v. United Healthcare Corp., et al.*, Civil Action No. 00-2800 (S.D.N.Y.).

76.    Since its inception, FAIR Health's benchmark databases have been used by state government agencies, medical societies, and other organizations to set reimbursement for non-participating providers.

77.    For example, the State of Connecticut uses FAIR Health's database to determine reimbursement for non-participating providers' emergency services under the state's consumer protection law.

78.    Defendants tout the use of FAIR Health and its benchmark databases to determine non-participating, out-of-network payment amounts on its website.

79.    As stated on UnitedHealthCare's website (https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits) for non-participating provider claims, the relevant United Health Group affiliate will "in many cases" pay the lower of a provider's actual billed charge or "the reasonable and

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

customary amount," "the usual customary and reasonable amount," "the prevailing rate," or other similar terms that base payment on what health care providers in the geographic area are charging.

80.     While Defendants give the appearance of remitting reimbursement to non-participating providers that meet usual and customary rates and/or the reasonable value of services based on geography that is measured from independent benchmark services such as the FAIR Health database, Defendants have found other ways to manipulate the reimbursement rate downward from a usual and customary or reasonable rate in order to maximize profits at the expense of Providers.

81.     For example, beginning in or around 2009, Defendants imposed significant cuts to Providers' reimbursement rate for out-of-network claims under Defendants' fully funded plans, without rationale or justification.

82.     Defendants pay claims under fully funded plans out of their own pool of funds, so every dollar that is not paid to Providers is a dollar retained by Defendants for their own use.

83.     Defendants' detrimental approach to payments for members in fully funded plans continues today, Defendants have made payment to Providers at rates less than 20% of billed charges.

84.     For example, for Member #10 who, upon information and belief, is a member of a fully funded plan treated by Provider Emergency Group AZ on April 22, 2019, Providers billed Defendants $1,212.00 for CPT Code 99284, the code used for a moderately severe problem, and Defendants allowed just 19.2% of billed charges, or $233.22, a rate significantly below reasonable rates.

85.     As another example, on April 23, 2019, Provider Emergency Group AZ treated Member #11 who, upon information and belief, is a member of a fully funded plan, and billed Defendants $1,212.00 for CPT Code 99284.  Defendants allowed 20% of billed charges, or $246.34.

86.    As a result of these deep cuts in payments for services provided to Members of fully funded plans, Defendants have not paid Providers a reasonable rate for those services since 2009.

87.    In so doing, Defendants have illegally retained those funds.

### *Defendants' Current Schemes*

88.    In 2017, Defendants also attempted to pay less than a reasonable rate on their employer funded plans, further exacerbating the financial damages to Providers.

89.    From late 2017 to 2018, over the course of multiple meetings in person, by phone, and by email correspondence, Providers' representatives tried to negotiate with Defendants to become participating, in-network providers.

90.    As part of these negotiations, Providers' representatives met with Dan Rosenthal, President of Defendant UnitedHealth Networks, Inc., John Haben, Vice President of Defendant UnitedHealth Networks, Inc., and Greg Dosedel, Vice President of National Ancillary Contracting & Strategy at Defendant UnitedHealthCare Services, Inc.

91.    Around December 2017, Mr. Rosenthal told Providers' representatives that Defendants intended to implement a new benchmark pricing program specifically for their employer funded plans to decrease the rate at which such claims were to be paid.

92.    Defendants then proposed a contractual rate for their employer funded plans that was roughly half the average reasonable rate at which Defendants have historically reimbursed providers – a drastic and unjustified discount from what Defendants have been paying Providers for years on their non-participating claims in these plans, and an amount materially less than what Defendants were paying other contracted providers in the same market.

93.    Defendants' proposed rate was neither reasonable nor fair.

94.    In May 2018, Mr. Rosenthal escalated his threats, making clear during a meeting that, if Providers did not agree to contract for the drastically reduced rates,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Defendants would implement benchmark pricing that would reduce Plaintiffs' non-participating reimbursement by 33%.

95. Dan Schumacher, the President and Chief Operating Officer of UnitedHealthcare Inc. and part of the Office of the Chief Executive of Defendant UnitedHealth Group, Inc., said that, by April 2019, Defendants would cut Providers' non-participating reimbursement by 50%.

96. Asked why Defendants were forcing such dramatic cuts on Providers' reimbursement, Mr. Schumacher said simply "because we can."

97. Defendants made good on their threats and knowingly engaged in a fraudulent scheme to slash reimbursement rates paid to Providers for non-participating claims submitted under their employer funded plans to levels at, or even below, what they had threatened in 2018.

98. Defendants falsely claim that their new rates comply with the law because they contracted with a purportedly objective and transparent third party, Data iSight, to process Providers' claims for employer funded plans and to determine reasonable reimbursement rates.

99. Data iSight is the trademark of an analytics service used by health plans to set payment for claims for services provided to Defendants' Members by non-participating providers. Data iSight is owned by National Care Network, LLC, a Delaware limited liability company with its principal place of business in Irving, Texas. Data iSight and National Care Network, LLC will be collectively referred to as "Data iSight." Data iSight is a wholly-owned subsidiary of MultiPlan, Inc., a New York corporation with its principal place of business in New York, NY. MultiPlan acts as a Rental Network "broker" and, in this capacity, has contracted since 2011 with Providers Emergency Physicians SW and Chase Dennis and since 2013 with Provider Emergency Group AZ to secure reasonable rates from payors for Providers' non-participating emergency services. Providers have no contract with Data iSight, and the non-

participating claims identified in this action are not adjudicated pursuant to the MultiPlan agreement.

100.    Since January 2019, Defendants have engaged in a scheme and conspired with Data iSight to impose arbitrary and unreasonable payment rates on Providers under the guise of utilizing an independent, objective database purportedly created by Data iSight to dictate the rates imposed by Defendants.

101.    Defendants also continued to advance this scheme on the negotiation front.

102.    On July 7, 2019, Mr. Schumacher advised, in a phone call, that Defendants planned to cut Providers' rates over three years to just 42% of the average and reasonable rate of reimbursement that Providers had received in 2018 if Providers did not formally contract with them at the rate dictated by Defendants.

103.    Mr. Schumacher additionally advised that leadership across the Defendant entities were aware and supportive of the drastic cuts and provided no objective basis for them.

104.    The next day, Angie Nierman, a Vice President of Networks at UnitedHealth Group, Inc., sent a written proposal reflecting Mr. Schumacher's stated cuts.

105.    In addition to denying Providers what is owed to them for the Non-Participating Claims, Defendants' scheme is an attempt to use their market power to reset the rate of reimbursement to unreasonably low levels.

***RICO Defendants' Fraudulent Schemes to Deprive Providers of Reasonable Reimbursement Violates Arizona's Civil Racketeering Statute***

106.    Each Defendant, UnitedHealth Group, Inc., United Healthcare, Inc., UnitedHealthcare of Arizona, Inc., United Health Care Services Inc., UMR, Inc.; UnitedHealthcare Integrated Services, Inc. and UnitedHealthcare Specialty Benefits, LLC (collectively, the "RICO Defendants") violated AZ RICO (A.R.S. § 13-2301 *et seq.*), and in particular, A.R.S. § 13-2314.04 in connection with a scheme or artifice to defraud Providers through a pattern of unlawful activity in which the RICO Defendants devised,

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

1  conducted, and participated in with unnamed third parties, including, but not limited to,

2  Data iSight, in order to obtain benefits by means of false or fraudulent pretenses,

3  representations, promises and material omissions.

4        107.   The Enterprise, as defined in A.R.S. § 13-2301(D)(2), consists of the RICO

5  Defendants, non-parties Data iSight and other entities that develop software used in

6  reimbursement determinations used by the RICO Defendants (the "Enterprise").  The

7  participants of the Enterprise are associated, upon information and belief, by virtue of

8  contractual agreement(s) and/or other arrangement(s) wherein they have agreed to

9  undertake a common goal of reducing payments to Providers for the benefit of the

10  Enterprise.  The Enterprise participants communicate routinely through telephonic and

11  electronic means as they unilaterally impose reimbursement rates based on their

12  manipulated "data" but which is nothing more than a transparent attempt to impose

13  artificially reduced reimbursement rates that the RICO Defendants threatened during

14  business-to-business negotiations.

15        108.   The RICO Defendants illegally conduct the affairs of the Enterprise, and/or

16  control the Enterprise, that includes Data iSight, through a pattern of unlawful activity.

17        109.   As part of this scheme, the RICO Defendants prepared to, and did

18  knowingly and unlawfully, reduce Providers' reimbursement rates for the non-

19  participating claims to amounts significantly below the reasonable rate for services

20  rendered to RICO Defendants' Members, to the detriment of Providers and to the benefit

21  and financial gain of RICO Defendants and Data iSight.

22        110.   To carry out the scheme and in furtherance of the conspiracy, RICO

23  Defendants and Data iSight engaged in conduct that violated Arizona laws, including,

24  *inter alia*, A.R.S. §§ 13-2310, 13-2312.

25        111.   Since January 2019, the Enterprise worked together to manipulate and

26  artificially lower non-participating provider reimbursement data that coincides and

27  matches the earlier threats made by United Health Group in an effort to avoid paying

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Providers for the usual and customary fee or rate and/or for the reasonable value of the services provided to Defendants' Members for emergency medicine services. The unilateral reduction in reimbursement rates is not founded on actual statistically sound data, and is not in line with reimbursement rates that can be found through sites such as the FAIR Health database, a recognized source for such reimbursement rates. Each time the RICO Defendants direct payment using manipulated reimbursement rates and issue Providers a remittance, the RICO Defendants further their scheme or artifice to defraud Providers because the RICO Defendants retain the difference between the amount paid based on the artificially reduced reimbursement rate and the amount paid that should be paid based on the usual and customary fee or rate and/or the reasonable value of services provided, to the detriment of the Providers who have already performed the services being billed. Further, Providers' representatives have contacted Data iSight and have been informed that acceptable reimbursement rates are actually influenced and/or determined by Defendants, not Data iSight.

112.    As a result of the scheme, RICO Defendants have injured Providers in their business or property by a pattern of unlawful activity in violation of A.R.S. § 13-2314.04.

### *RICO Defendants and Data iSight's Activities Constitute a Pattern of Unlawful Activity*

113.    RICO Defendants and Data iSight committed, and continue to commit, related predicate acts of unlawful activity, pursuant to a scheme or artifice to defraud, knowingly obtain benefits by means of false or fraudulent pretenses, representations, promises or material omissions and illegally controlled an enterprise through unlawful acts, such that they have engaged in a "pattern of racketeering activity" under A.R.S. § 13-2310 and § 13-2312 and pose a continued threat of unlawful activity, as described below.

114.    RICO Defendants and Data iSight have knowingly, wrongfully, and unlawfully reduced payment to Providers for the emergency services that Providers

provided to Defendants' Members, to the financial gain of the RICO Defendants and Data iSight.

115.    The pattern of unlawful activity has happened on more than two occasions that have happened within five years of each other.  In fact, the RICO Defendants have processed and submitted a substantial number of artificially reduced payments to Providers since January 2019.

116.    As a direct and proximate result of those activities, Providers have suffered in excess of one million dollars in discrete and direct financial loss that stem from the RICO Defendants' knowing retention of payment that is founded on a scheme to manipulate payment rates and payment data to their benefit.

### *The Enterprise and Scheme*

117.    The Enterprise is comprised of RICO Defendants and third-party entities, to include Data iSight, that developed software used in reimbursement determinations by RICO Defendants.

118.    RICO Defendants and Data iSight agreed to, and do, manipulate reimbursement rates and control allowed payments to Providers through acts of the Enterprise.

119.    The RICO Defendants and Data iSight conceal their scheme by hiding behind written agreements and/or other arrangements, and false statements.

120.    Since at least January 1, 2019, the RICO Defendants, by virtue of their engagement and use of Data iSight, have falsely claimed to provide transparent, objective, and geographically-adjusted determinations of reimbursement rates.

121.    In reality, Data iSight is used as a cover for RICO Defendants to justify paying reimbursement to Providers at rates that are far less than the reasonable payment rate that Providers have historically received and are entitled to under the law.  The reimbursement rates purportedly collected and employed by Data iSight are nothing more than an instrumentality for the RICO Defendants' unilateral decision to stop paying

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Providers the usual and customary fee and/or the reasonable value of the services provided.

122.    This scheme is concealed through the use of false statements on Data iSight's website and in RICO Defendants' and Data iSight's communications with providers, including Providers' representatives.

123.    The Enterprise's scheme, as described below, was, and continues to be, accomplished through written agreements, association, and sharing of information between RICO Defendants and Data iSight.

*The Enterprise's False Statements: Transparency*

124.    By the end of June 2019, just over half of non-participating claims submitted to RICO Defendants were being processed for payment by Data iSight.

125.    The Data iSight website claims to offer "Transparency for You, the Provider," and that the "website makes the process for determining appropriate payment transparent to [providers]. . . so all parties involved in the billing and payment process have a clear understanding of how the reduction was calculated."

126.    Contrary to these claims, however, the Enterprise, through Data iSight, uses layers of obfuscation to hide and avoid providing the basis or method it uses to derive its purportedly "appropriate" rates.

127.    This concealment was designed by the Enterprise to, and does, prevent Providers from receiving a reasonable payment for the services they provide.

128.    For claims whose reimbursement is determined by Data iSight, non-participating providers receive a Provider Remittance Advice form ("Remittance") from Defendants with "IS" or "1J" in the "Remark/Notes" column.

129.    Over the past six months, an ever-increasing number of non-participating claims have been processed by Data iSight with drastically reduced payment amounts.

130.    Yet RICO Defendants and Data iSight do not state, on the face of the Remittance, or anywhere else, any reason for the dramatic cut.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

131.    Instead, the Remittances contain a note to call a toll-free number if there are questions about the claim.

132.    In July 2019, a representative of Provider Emergency Group AZ contacted Data iSight via that number to discuss a claim with CPT Code 99284 (emergency department visit, problem of high severity) which had been billed at $1,190.00, but for which Data iSight had allowed and paid $295.28, just 24.8% of billed charges.

133.    After Provider's representative spoke with Data iSight's intake representative, a Data iSight representative, Michele Ware ("Ware"), called back and claimed the billed charges were paid based on a percentage of the Medicare fee schedule. Provider's representative challenged the reasonableness of the $295.28 payment.  After learning that Provider had not yet billed Defendants' Member for the difference, Ware stated "ok – so you're willing negotiate" and offered to pay 80% of billed charges.  In response, Provider's representative asked for payment of 85% of billed charges – $1,011.50 – to which Ware promptly agreed.

134.    Immediately thereafter, Ware sent a written agreement for Provider's representative to review and sign, confirming payment of $1,011.50 as payment in full and an agreement not to balance bill Defendants Services' Member or Member's Family.

135.    Providers' representatives have experienced this same trend across the country with Data iSight.  In one instance, when asked to provide the basis for the dramatic cut in payment for the claims, a Data iSight representative by the name of Phina (Last Name Unknown) ("LNU"), did not and could not explain how the amount was derived or how it was determined that a cut was appropriate at all.  The representative could only say that the payments on the claims represented a certain percentage of the Medicare fee schedule; she could not explain how Data iSight had arrived at that payment for either of the two claims, or why it allowed a different amount for each claim.

136.    Instead, the representative simply stated that the rates were developed by Data iSight and Defendants.  When Providers continued to pursue the issue and spoke

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

with a Data iSight supervisor, James LNU, to inquire as to the basis for these determinations, James LNU responded that "it is just an amount that is recommended and sent over to United [HealthCare]."  When James LNU was expressly challenged on Data iSight's false claim that it is transparent with providers, he responded with silence.

137.    Further attempts to understand Data iSight and obtain information about the basis for its reimbursement rate-setting from Data iSight executives have also been futile.

138.    Data iSight and the RICO Defendants know that the rates that Data iSight have allowed for Providers' claims in 2019 are unreasonable and are not, in fact, based on objective, reliable data designed to arrive at a reasonable reimbursement rate.

139.    Defendants know this because when a provider challenges the payment, Data iSight and RICO Defendants are authorized to revise the allowed amount back up to a reasonable rate, but only if the Provider persists long enough in the process.

140.    This process to contest the unreasonable payment takes weeks to conclude for the Provider and is impracticable to follow for every claim – a fact that RICO Defendants and Data iSight understand.

141.    For example, as evidence of this fraudulent practice Providers' representatives contested the allowed amounts on the claims discussed above.

142.    Eventually, Data iSight's "Quality Control" team, offered to allow payment of both claims at 85% of their respective billed charges.

143.    Absent providers taking the time to chase every claim, Data iSight and RICO Defendants are able to get away with paying a rate that they know is not based on objective data and is far below the reasonable one.

144.    Moreover, the Enterprise's scheme of refusing to reimburse at reasonable rates unless and until Providers challenge its determinations continually harms Providers, in that, even if Providers eventually receive reasonable reimbursement upon contesting the rate, this scheme burdens Providers with excessive administrative time and expense and deprives Providers of their right to prompt payment.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ⬧ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

*The Enterprise's False Statements:  Representations that Payment Rates Are "Defensible and Market Tested"*

145.    The Enterprise's claim to "transparency" is not its only fraudulent representation.

146.    The Enterprise, through Data iSight, also falsely represents, on Data iSight's website, to set reimbursement rates in a "defensible, market tested" way.

147.    Claims processed by Data iSight contain the following note:

> MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835- 4022 OR VISIT DATAISIGHT.COM. THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. **PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS).** PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

(emphasis added).

148.    This note is intended to, and does, mislead Providers to believe that the reimbursement calculations are tied to external, objective data.

149.    Further, in its provider portal, Data iSight describes its "methodology" for reimbursement determinations as "calculated using paid claims data from millions of claims . . . . The Data iSight reimbursement calculation is based upon standard relative value units where applicable for each CPT/HCPCS code, multiplied by a conversion factor."

150.   Data iSight's parent company, MultiPlan, similarly describes Data iSight's process as using "cost- and reimbursement-based methodologies" and notes that it has been "[v]alidated by statisticians as effective and fair."

151.   These statements are false.

152.   Data iSight's rates are not data-driven: they match the rate threatened by RICO Defendants in 2018 and are whatever RICO Defendants want, and direct Data iSight, to allow.

153.   For example, over three months, Providers submitted claims for three patients who, upon information and belief, are members of employer funded plans under CPT Code 99284, but received reimbursement in very different allowed amounts:

a.    Member #12 was treated by Provider Emergency Group of AZ on January 31, 2019.  Provider billed RICO Defendants $579.00 for procedure code 99284, and RICO Defendants allowed $521.10 through MultiPlan, which is approximately 90% of billed charges – a reasonable rate, in line with the reasonable rate paid by RICO Defendants to Provider for non-participating provider services.

b.    But, for Member #13, who was treated by Provider Emergency Group AZ on January 3, 2019, RICO Defendants, through Data iSight, allowed only $295.28, which is only 24% of billed charges ($1,190.00).

c.    For Member #14, who was treated by Provider on January 25, 2019, Provider billed $1,212.00 for the same procedure code and RICO Defendants, through Data iSight, allowed only $413.39, or 34% of billed charges.

154.   In another example, Plaintiffs submitted claims under CPT Code 99285 for patients in, upon information and belief, employer funded plans, again within weeks of each other, but RICO Defendants reimbursed at dramatically different and decreasing levels, negating any claim RICO Defendants have that their reimbursement determinations are tied to a reasonable, defensible, market-tested standard:

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

d.    Member #15 was treated by Provider Emergency Group AZ on January 27, 2019.  Provider billed RICO Defendants $568.00 for CPT Code 99284, and RICO Defendants, through MultiPlan, allowed $511.20, which is 90% of Provider's billed charge.

e.    Then, for Member #16, who was seen by Provider Emergency Group AZ on January 1, 2019, the RICO Defendants, through Data iSight, allowed only $413.39, which is approximately 34% of Provider's billed charges of $1,190.00.

155.   This lock-step reduction, consistent with RICO Defendants' 2018 threats to drastically reduce rates even further if Providers failed to agree to their proposed contractual rates, spans a significant number of Providers' claims for payment for services to RICO Defendants' Members.

156.   From the above examples, it is clear that Data iSight is not using any externally-validated methodology to establish a reasonable reimbursement rate, as its rates are not consistent, defensible, or reasonable.

157.   Rather, RICO Defendants, in complicity with Data iSight, increasingly reimburse for Providers at entirely unreasonable rates, in retaliation for Providers' objections to their reimbursement scheme, and completely contrary to their false assertions designed to mislead Providers and similar providers into believing that they will receive payment at reasonable rates.

158.   This reimbursement is dictated by RICO Defendants, to the financial detriment of Providers.

### The Enterprise's False Statements:  Geographic Adjustment

159.   In addition to false statements regarding transparency and its methodologies, the Enterprise furthered the scheme by using false statements promising geographic adjustments to allowed rates.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

160.   Indeed, on its provider portal, Data iSight falsely claims that "[a]ll reimbursements are adjusted based on your geographic location and the prevailing labor costs for your area."

161.   Data iSight's parent company, MultiPlan, further falsely states on its website that:

> For professional claims where actual costs aren't readily available, Data iSight determines a fair price using amounts generally accepted by providers as full payment for services. Claims are first edited, and then priced using widely-recognized, AMA created Relative Value Units (RVU), to take the value and work effort into account [and] CMS Geographic Practice Cost Index, to adjust for regional differences . . . [then] Data iSight multiplies the geographically-adjusted RVU for each procedure by a median based conversion factor to determine the reimbursement amount. This factor is specific to the service provided and derived from a publicly-available database of paid claims.

162.   Contrary to those statements, however, claims from providers in different geographic locations show that Data iSight does not adjust for geographic differences but instead, works with RICO Defendants to cut uniformly out-of-network provider payments across geographic locations.

163.   For example, Member WY was treated in Wyoming on January 21, 2019. The provider billed RICO Defendants $779 for procedure code 99284, and RICO Defendants, via Data iSight, allowed $413.39.

164.   Four days later, on January 25, 2019, Provider Emergency Group of AZ treated Member AZ in Arizona and billed RICO Defendants $1,212.00 for CPT Code 99284 and RICO Defendants, via Data iSight, allowed exactly $413.39.

165.   On the same date, Member NH was treated on the other side of the country in New Hampshire. The provider billed RICO Defendants $1,047 for procedure 99284, and RICO Defendants, via Data iSight, again allowed $413.39.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

166.    On February 8, 2019, Member OK was treated in Oklahoma. The provider billed RICO Defendants $990 for procedure code 99284, and RICO Defendants, via Data iSight, allowed $413.39.

167.    Two days later, Members KS and NM were treated in Kansas and New Mexico, respectively. The providers billed RICO Defendants $778.00 and $895.00, respectively, for procedure code 99284, but for both of these claims, RICO Defendants, via Data iSight, allowed exactly $413.39.

168.    One month later, Member CA was treated in California. The provider billed RICO Defendants $937.00 for procedure code 99284. RICO Defendants, via Data iSight, yet again allowed exactly $413.39.

169.    Two months later, on May 20, 2019, a provider treated Member PA in Pennsylvania and billed RICO Defendants $1,094 for procedure code 99284, and RICO Defendants, via Data iSight, allowed exactly $413.39.

| Patient | Location | Date of Service | Billed Amount | CPT Code | Allowed Amount |
|---------|----------|-----------------|---------------|----------|----------------|
| WY | Wyoming | 1/21/19 | $779 | 99284 | $413.39 |
| AZ | Arizona | 1/25/19 | $1,212 | 99284 | $413.39 |
| NH | New Hampshire | 1/25/19 | $1047 | 99284 | $413.39 |
| OK | Oklahoma | 2/8/19 | $990 | 99284 | $413.39 |
| KS | Kansas | 2/10/19 | $778 | 99284 | $413.39 |
| NM | New Mexico | 2/10/19 | $895 | 99284 | $413.39 |
| CA | California | 3/25/19 | $937 | 99284 | $413.39 |
| PA | Pennsylvania | 5/20/19 | $1,094 | 99284 | $413.39 |

170.    RICO Defendants falsely claim on their website to "frequently use" the 80th percentile of the FAIR Health Benchmark databases "to calculate how much to pay for out-of-network services."

171.    The 80th percentile of FAIR Health Benchmark databases clearly shows that reimbursement for the above non-participating provider charges, when actually based on

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

a geographically-adjusted basis, would not only vary widely, but also all be higher than the allowed $413.39:

| Location | CPT Code | 80th Percentile of Fair Health Benchmark |
|----------|----------|------------------------------------------|
| Wyoming | 99284 | $1,105 |
| New Hampshire | 99284 | $753 |
| Oklahoma | 99284 | $1,076 |
| Kansas | 99284 | $997 |
| New Mexico | 99284 | $1,353 |
| California | 99284 | $795 |
| Pennsylvania | 99284 | $859 |
| Arizona | 99284 | $1,265 |

### *The Enterprise's Predicate Acts*

172.    To perpetuate the scheme and conceal it from Providers, in or around 2018, RICO Defendants and Data iSight entered into written agreements with each other that are consistent with Data iSight's agreements with similar health insurance companies.

173.    Under those contracts, Data iSight would handle claims determinations for services rendered to RICO Defendants' Members under pre-agreed thresholds set by RICO Defendants.

174.    By no later than 2019, RICO Defendants and Data iSight then coordinated and effectuated the posting of false statements on websites and the communication of false statements to providers, including Providers, in furtherance of the scheme.

175.    These statements include Data iSight and its parent company posting that it would provide a transparent, defensible, market-based, and geographically-adjusted claims adjudication and payment process for providers.

176.    Data iSight communicated to Providers' representatives by phone and by email in June 2019 that, contrary to its website's claims to transparency, Data iSight could not provide a basis for its unreasonably low allowed amount, mustering only that "it is just an amount that is recommended and sent over to United [HealthCare]."

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

177.    Finally, after weeks of pressure, Data iSight informed Providers by phone that it would, after all, allow payment on the contested claims at a reasonable rate: 85% of billed charges.

178.    In short, the Enterprise perpetuated its scheme by communicating threats regarding reimbursement cuts to Providers in late 2017 and 2018.

179.    Then, after making good on those threats, the Enterprise communicated false and misleading information to Providers and falsely denied that it had information requested by Providers about the basis for the drastically-cut and unreasonable reimbursement rates that RICO Defendants sought to impose.

180.    In addition, since at least January 1, 2019, the Enterprise has furthered this scheme by communicating payment amounts and making reimbursement payments to Providers at rates that were far below usual and customary rates and/or reasonable rates for the services provided.

181.    For example, on March 5, 2019, RICO Defendants sent Plaintiffs, a Remittance for emergency services provided to Members under multiple procedure codes, including the following for CPT Codes 99284 and 99285:

f.    Member #17 was treated on January 1, 2019 at a billed charge of $1,190.00 (CPT Code 99284), for which RICO Defendants, via Data iSight, allowed $413.39.

g.    Member #18 was treated on January 30, 2019, at a billed charge of $1,890.00 (CPT Code 99285), for which RICO Defendants, via Data iSight, allowed $435.20.

h.    Member #19 was treated on May 26, 2019, at a billed charge of $862.00 (CPT Code 99285), for which RICO Defendants, via Data iSight, allowed $291.86.

i.    Yet, Member #20 was treated on January 21, 2019, at a billed charge of $1,190.00 (CPT Code 99284), for which RICO Defendants, via MultiPlan, allowed

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

$1,071.00 which is 90% of billed charges.  This a reasonable rate, in line with the reasonable rates historically paid by RICO Defendants to Providers for non-participating provider services.

182.    RICO Defendants and Data iSight expected that those unreasonable payments would be accepted in full satisfaction of Providers' claims.

183.    RICO Defendants and Data iSight have received, and continue to receive, financial gains from their scheme to defraud Providers.

184.    For the services that Providers provided to RICO Defendants' Members in 2019, only 26% of the non-participating claims have, to date, been reimbursed at reasonable rates, resulting in millions of dollars in financial loss to Providers.

185.    The purpose of, and the direct and proximate result of the above-alleged Enterprise and scheme was, and continues to be, to unlawfully reimburse Providers at unreasonable rates, to the harm of Providers, and to the benefit of the Enterprise.

**FIRST CLAIM FOR RELIEF**

**(Breach of Implied-in-Fact Contract)**

36.186.         Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

37.187.          At all material times, Providers were obligated under federal and Arizona law to provide emergency medicine services to all patientsPatients presenting at the emergency departments they staff, including United HealthCare PatientsDefendants' Members.

188.    At all material times, United HealthCareDefendants were obligated to provide coverage for emergency medicine services to all of its Members.  *See e,g.* A.R.S. § 20-2803.

38.189.         At all material times, Defendants knew that Providers were non-participating emergency medicine groups that provided emergency medicine services to Patients.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

39.190.    Providers have undertaken to provide emergency medicine services to ~~United HealthCare's Patients~~Defendants' Members, and ~~United HealthCare has~~Defendants have undertaken to pay for such services provided to ~~United HealthCare's Patients~~Defendants' Members.

40.191.    At all material times, ~~United HealthCare was~~Defendants were aware that Providers were entitled to and expected to be paid at rates in accordance with the standards established under Arizona law.

41.192.    At all material times, ~~United HealthCare has~~Defendants have received Providers' bills for the emergency medicine services Providers provided and continue to provide to ~~United HealthCare's Patients, and United HealthCare has~~Defendants' Members, and Defendants have consistently adjudicated and paid, and continues to adjudicate and pay, Providers directly for the non-participating claims, albeit at amounts less than usual and customary and/or reasonable rates.

42.193.    Through the parties' conduct and respective undertaking of obligations concerning emergency medicine services provided by Providers to ~~United HealthCare's Patients~~Defendants' Members, the parties implicitly agreed, and Providers had a reasonable expectation and understanding, that ~~United HealthCare~~Defendants would reimburse Providers for non-participating claims at rates in accordance with the standards acceptable under Arizona law and in accordance with rates ~~United HealthCare pays~~Defendants pay for other substantially identical claims also submitted by Providers.

43.194.    Under Arizona common law, including the doctrine of quantum meruit, ~~United HealthCare~~Defendants, by undertaking responsibility for payment to Providers for the services rendered to ~~United HealthCare~~Defendants' Patients, impliedly agreed to reimburse Providers at rates, at a minimum, equivalent to the reasonable value of the professional emergency medical services provided by Providers.

44.195.    ~~United HealthCare~~Defendants, by undertaking responsibility for payment to Providers for the services rendered to ~~United HealthCare's~~

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

PatientsDefendants' Members, impliedly agreed to reimburse Providers at rates, at a minimum, equivalent to the usual and customary rate or alternatively for the reasonable value of the professional emergency medical services provided by Providers.

45.196.    In breach of its implied contract with Providers, United HealthCare hasDefendants have and continuecontinues to unreasonably and systemically adjudicate the non-participating claims at rates substantially below both the usual and customary fees in the geographic area and the reasonable value of the professional emergency medical services provided by Providers to the United HealthCare'sDefendants' Patients.

46.197.    Providers have performed all obligations under its implied contract with United HealthCareDefendants concerning emergency medical services to be performed for Patients.

47.198.    At all material times, all conditions precedent have occurred that were necessary for United HealthCareDefendants to perform its obligations under their implied contract to pay Providers for the non-participating claims, at a minimum, based upon the "usual and customary fees in that locality" or the reasonable value of Providers' professional emergency medicine services.

48.199.    Providers did not agree that the lower reimbursement rates paid by United HealthCareDefendants were reasonable or sufficient to compensate Providers for the emergency medical services provided to Patients.

49.200.    Providers have suffered damages in an amount equal to the difference between the amounts paid by United HealthCareDefendants and the usual and customary fees professional emergency medicine services in the same locality, that remain unpaid by United HealthCareDefendants through the date of trial, plus Providers' loss of use of that money; or in an amount equal to the difference between the amounts paid by United HealthCareDefendants and the reasonable value of its professional emergency medicine services, that remain unpaid by United HealthCareDefendants through the date of trial, plus Providers' loss of use of that money.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

50.201.     As a result of ~~United HealthCare's~~Defendants' breach of the implied contract to pay Providers for the non-participating claims at the rates required by Arizona law, Providers have suffered injury and is entitled to monetary damages from ~~United HealthCare~~Defendants to compensate it for that injury in an amount in excess of $300,000.00 ~~.~~, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

**SECOND CLAIM FOR RELIEF**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

51.202.     Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

52.203.     Providers and ~~United HealthCare had~~Defendants have a valid implied-in-fact contract as alleged herein.

53.204.     A special element of reliance or trust between Providers and ~~United HealthCare~~Defendants, such that, ~~United HealthCare was~~Defendants were in a superior or entrusted position of knowledge.

54.205.     That Providers did perform all or substantially all of their obligations pursuant to the implied-in-fact contract.

55.206.     By paying substantially low rates that did not reasonably compensate Providers the usual and customary rate or alternatively for the reasonable value of the services ~~provide, United HealthCare~~provided, Defendants performed in a manner that was unfaithful to the purpose of the implied-in-fact contract, or deliberately contravened the intention and sprit of the contract.

56.207.     That ~~United HealthCare's~~Defendants' conduct was a substantial factor in causing damage to Providers.

57.208.     As a result of ~~United HealthCare's~~Defendants' breach of the implied covenant of good faith and fair dealing, Providers have suffered injury and are entitled to

Page 39 of 51

monetary damages from ~~United HealthCare~~Defendants to compensate them for that injury in an amount in excess of $300,000.00, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

~~58.~~209.    The acts and omissions of ~~United HealthCare~~Defendants as alleged herein were attended by circumstances of malice, oppression and/or fraud, thereby justifying an award of punitive or exemplary damages in an amount to be proven at trial.

…

…

…

## THIRD CLAIM FOR RELIEF

### (Alternative Claim for Unjust Enrichment)

~~59.~~210.    Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein. This claim is pled in the alternative.

~~60.~~211.    Providers rendered valuable emergency services to the Patients.

~~61.~~212.    ~~United HealthCare~~Defendants received the benefit of having their healthcare obligations to their plan ~~members~~Members discharged and their ~~members~~Members received the benefit of the emergency care provided to them by Providers.

~~62.~~213.    As insurers or plan administrators, ~~United HealthCare was~~Defendants were reasonably notified that emergency medicine service providers such as Providers would expect to be paid by ~~United HealthCare~~Defendants for the emergency services provided to Patients.

~~63.~~214.    ~~United HealthCare~~Defendants accepted and retained the benefit of the services provided by Providers at the request of the ~~members~~Members of its Health Plans, knowing that Providers expected to be paid a usual and customary fee based on locality, or alternatively for the reasonable value of services provided, for the medically

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

necessary, covered emergency medicine services it performed for ~~United HealthCare's Patients~~Defendants' Members.

64.215.    ~~United HealthCare has~~Defendants have received a benefit from Providers' provision of services to its Patients and the resulting discharge of ~~their~~its healthcare obligations owed to ~~their Patients~~its Members.

65.216.    Under the circumstances set forth above, it is unjust and inequitable for ~~United HealthCare~~Defendants to retain the benefit it received without paying the value of that benefit; i.e., by paying Providers at usual and customary rates, or alternatively for the reasonable value of services provided, for the claims that are the subject of this action and for all emergency medicine services that Providers will continue to provide to ~~United HealthCare's members~~Defendants' Members.

66.217.    Providers seek compensatory damages in an amount which will continue to accrue through the date of trial as a result of ~~United Healthcare's~~Defendants' continuing unjust enrichment.

67.218.    As a result of ~~United HealthCare's~~Defendants' actions, Providers have been damaged in an amount, exclusive of interest, costs and attorneys' fees, which will be proven at the time of trial.

68.219.    Providers sue for the damages caused by ~~United HealthCare's~~Defendants' conduct and are entitled to recover the difference between the amount ~~United HealthCare~~Defendants paid for emergency care Providers rendered to ~~its members~~their Members and the reasonable value of the service that Providers rendered to ~~United HealthCare~~Defendants by discharging ~~their~~its obligations to ~~its~~their plan members.

### FOURTH CLAIM FOR RELIEF
### (Violation of A.R.S. § 20-442)

69.220.    Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

70.221.    Arizona law provides that "[n]o person shall engage in this state in any trade practice which is prohibited by this article, or defined in this article as, or determined pursuant to this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."  A.R.S. § 20-442.

71.222.    The acts and omissions detailed herein are violative of A.R.S. § 20-442.

72.223.    By way of example only, Arizona law prohibits an insurer from engaging in unfair settlement practices.  A.R.S. § 20-461.  Prohibited unfair claim settlement practices include: (1) "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."  A.R.S. § 20-461(A)(6); and (2) "Failing to promptly provide a reasonable explanation of the basis in the insurance policy relative to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."  A.R.S. § 20-461(A)(14).

73.224.    As detailed above, United HealthCare hasDefendants have failed to comply with A.R.S. § 20-461 by failing to pay Providers' medical professionals the usual and customary rate for emergency care provided to United HealthCare'sDefendants' members.  By failing to pay Providers' medical professionals the usual and customary rate United HealthCare hasDefendants have violated Arizona law and committed an unfair settlement practice.

74.225.    Providers are therefore entitled to recover the difference between the amount United HealthcareDefendants paid for emergency care Providers rendered to their members and the usual and customary rate, plus court costs and attorneys' fees.

75.226.    Providers are entitled to damages in an amount, exclusive of interest, costs and attorneys' fees, that will be proven at the time of trial.

76.227.    United HealthCare hasDefendants have acted in bad faith regarding itstheir obligation to pay the usual and customary fee; therefore, Providers are entitled to recover punitive damages against United HealthCareDefendants.

**FIFTH CLAIM FOR RELIEF**

**(Violation of AZ Consumer Fraud Statute)**

77.228.    Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

78.229.    The Arizona Consumer Fraud Statute prohibits ~~United HealthCare~~Defendants from engaging in "any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." A.R.S. § 44-1522.

79.230.    The Arizona Consumer Fraud Statute provides for a private right of action.

80.231.    ~~United HealthCare has~~Defendants have violated the AZ Consumer Fraud Statute through ~~its~~their acts, practices, and omissions described above, including but not limited to (a) wrongfully refusing to pay Providers for the medically necessary, covered emergency services Providers provided to Members in order to gain unfair leverage against Providers now that they are out-of-network and in contract negotiations to potentially become a participating provider under a new contract in an effort to force the Providers to accept lower amounts than it is entitled for ~~its~~their services; ~~and~~ (b) engaging in systematic efforts to delay adjudication and payment of Providers' claims for their services provided to ~~United HealthCare's~~Defendants' members in violation of ~~United HealthCare's~~Defendants' legal obligations; and (c) misrepresenting that the use of Data iSight for its claims processing was founded on transparent actual statistically sound data, rates that are defensible and market tested and geographically based.

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

81.232.        As a result of ~~United HealthCare's~~Defendants' violations of the Consumer Fraud Statute, the Providers are entitled to damages in an amount to be determined at trial.

82.233.        Due to the willful and knowing engagement in consumer fraud practices, the Providers are entitled to recover damages, including statutory civil penalties permitted under § 44-1522 or otherwise, and all profits derived from the knowing and willful violation.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment)

83.234.        Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

84.235.        This is a claim for declaratory judgment and actual damages pursuant to A.R.S. 12-1831 *et seq.*

85.236.        As explained above, pursuant to federal and Arizona law, ~~United HealthCare is~~Defendants are required to cover and pay Providers for the medically necessary, covered emergency medicine services Providers have provided and continues to provide to ~~United HealthCare~~Defendants' members.

86.237.        Under Arizona law, ~~United HealthCare is~~Defendants are required to pay Providers the usual and customary rate for that emergency care.  Instead of reimbursing Providers at the usual and customary rate or for the reasonable value of the professional medical services, ~~United HealthCare~~Defendants has reimbursed Providers at reduced rates with no relation to the usual and customary rate.

87.238.        As alleged herein, Providers became out-of-network with the ~~United HealthCare.~~Defendants.    Since then, ~~United HealthCare has~~Defendants have demonstrated ~~its~~their refusal to timely settle insurance claims submitted by Providers and has failed to pay the usual and customary rate based on this locality in violation of ~~United HealthCare's~~Defendants' obligations under the Arizona Insurance Code, the parties'

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

implied-in-fact contract and pursuant to Arizona law of unjust enrichment and quantum merit.

88.239.    An actual, justiciable controversy therefore exists between the parties regarding the rate of payment for Providers' emergency care that is the usual and customary rate that United HealthCare isDefendants are obligated to pay.

89.240.    Pursuant to A.R.S. 12-1831 *et seq.*, Providers therefore request a declaration establishing the usual and customary rates that Providers are entitled to receive for all claims at up to and through trial, as well as a declaration that United HealthCare isDefendants are required to pay to Providers at a usual and customary rate for claims submitted thereafter.

## SEVENTH CLAIM FOR RELIEF

### (Violation of A.R.S. § 13-2314.04 - RICO Defendants)

241.    Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

242.    Arizona law allows for a private cause of action for injury resulting from a pattern of unlawful activity.  A.R.S. § 13-2301 *et seq.*  Specifically, A.R.S. § 13–2314.04(A) provides that:

> A person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity, or by a violation of § 13–2312 involving a pattern of racketeering activity, may file an action in superior court for the recovery of up to treble damages and the costs of the suit, including reasonable attorney fees for trial and appellate representation.

243.    "Racketeering" includes, among things, any act or preparatory act committed for financial gain, chargeable or indictable under the law where the act occurred and punishable by more than a year's imprisonment.  A.R.S. § 13-2301(D)(4)(b).

244.    A pattern of unlawful activity includes, among other things, a person who engages in illegally controlling an enterprise and a scheme or artifice to defraud that

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

results in knowingly obtaining a financial benefit by means of false or fraudulent pretenses, representations, promises or material omissions. A.R.S. § 13-2301(D)(4)(b)(xv); A.R.S. § 13-2310; A.R.S. § 13-2312.

245. A "pattern of racketeering activity" means, among things, that there must be at least two related and continuous acts of "racketeering" defined in § 13-2301(D)(4), including, but not limited to, item (xv). A.R.S. § 13-2314.04(T)(3)(a). Additionally, a pattern of unlawful activity requires relatedness, continuity and occurrence within five years of one another.

246. Since at least January 2019, Providers sustained reasonably foreseeable injury to their business by a pattern of unlawful activity and/or by violation of A.R.S § 13-2312 involving a pattern of unlawful activity.

247. Providers are a "person" within the meaning of A.R.S. § 13-2314.04(A).

248. The RICO Defendants are a "person" within the meaning of A.R.S. § 13-2310.

249. Since at least January 2019, the RICO Defendants, have been and continue to be, engaged in preparations and implementation of a scheme to defraud Providers by committing a series of unlawful acts designed to obtain a financial benefit by means of false or fraudulent pretenses, representations, promises or material omissions which constitute predicate unlawful activity under A.R.S. § 13-2310, in violation of in violation of A.R.S. § 13-2314.04. The RICO Defendants have engaged in more than two related and continuous acts amounting to a pattern of unlawful activity pursuant to a scheme or artifice to defraud and to which the RICO Defendants have committed for financial benefit and gain to the detriment of Providers. The RICO Defendants, on more than two occasions, have schemed with Data iSight to artificially and without foundation substantially decrease non-participating provider reimbursement rates while continuing to represent that the reimbursement rates are based on legitimate cost data or paid data.

250.    The foregoing acts establish a pattern of unlawful activity are related to each other in that they further the joint goal of unfairly and illegally retaining financial benefit to the detriment of Providers.  In each of the examples provided herein, the acts alleged to establish a pattern of unlawful activity are related because they have the same or similar purposes, results, participants, victims and/or methods of commission.

251.    Since at least January 2019, RICO Defendants have been and continue to be, a part the Enterprise within the meaning of A.R.S. § 13-2301(D)(2), comprised the RICO Defendants and Data iSight, and which Enterprise was and is illegally controlled by the RICO Defendants and/or being illegally conducted through a pattern of unlawful activity or participating directly or indirectly in the conduct of the Enterprise.

252.    Each of the RICO Defendants has an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

253.    RICO Defendants and Data iSight had, and continue to have, the common and continuing purpose of dramatically reducing allowed provider reimbursement rates for their own pecuniary gain, by defrauding Providers and preventing Providers from obtaining reasonable payment for the services they provided to RICO Defendants' Members, in retaliation for Providers' lawful refusal to agree to RICO Defendants' massively discounted and unreasonable proposed contractual rates.

254.    Each RICO Defendant provides benefits to insured members, processes claims for services provided to members, and/or issues payments for services and knows and willingly participates in the scheme to defraud Providers.

255.    As a direct and proximate result of RICO Defendants' violations of A.R.S. § 13-2314.04, Providers have sustained a reasonably foreseeable injury in their business by a pattern of unlawful activity, suffering direct and substantial financial losses within the meaning of A.R.S. § 13-2314.04. Specifically, but for the unlawful acts of the RICO Defendants in falsely representing the validity of Data iSight statistical data, Providers would not have suffered the loss of millions of dollars in underpaid claims which the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

RICO Defendants repeatedly represented were reasonable/usual and customary rates of payment.

256.    RICO Defendants have been and continue to be, a part of an enterprise within the meaning of A.R.S. § 13-2301(D)(2).

257.    The RICO Defendants have and are illegally controlling the Enterprise by acquiring or maintaining, by investment or otherwise, control of any enterprise through a pattern of unlawful activity or their proceeds; and/or illegally conducting an enterprise, i.e., a person employed by or associated with enterprise is conducting the affairs of the Enterprise through a pattern of unlawful activity or participating directly or indirectly in the conduct of any enterprise that the person knows is being conducted through a pattern of unlawful activity.  A.R.S. § 13-2312(A)-(B).

258.    For purposes of A.R.S. § 13-2301(D)(1), the RICO Defendants "control" the Enterprise because they possess sufficient means to permit substantial direction over the affairs of the Enterprise.  A.R.S. § 13-2301(D)(1).

259.    As an Enterprise that acquired financial benefit or property through violation of A.R.S. § 13-2312, the RICO Defendants are involuntary trustees, and the involuntary trustees, must hold the property, their proceeds and their fruits in constructive trust for the benefit of persons entitled to remedies under A.R.S. § 13-2314.04.  A.R.S. § 13-2314.04(D)(6).

260.    Providers are entitled to damages in an amount, exclusive of interest, costs and attorneys' fees, that will be proven at the time of trial.

261.    Providers are entitled to treble damages and the costs of the suit, including reasonable attorney fees for trial and appellate representation pursuant to A.R.S. § 13-2314.04.

**PRAYER FOR RELIEF**

WHEREFORE, Providers pray for judgment as follows:

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

A.    ~~For judgment~~Judgment in their favor on their ~~complaint~~First Amended Complaint;

B.    ~~For awards~~Awards of actual, consequential, general, and special damages in an amount which will be proven at trial;

C.    ~~For an~~An award of punitive damages, the exact amount of which will be proven at trial;

D.    A ~~Declaratory Judgment~~declaratory judgment that ~~United HealthCare's~~Defendants' failure to pay Providers a usual and customary fee or rate for this locality or alternatively, for the reasonable value of their services, violates Arizona law, breaches the parties' implied-in-fact contract, is a tortious breach of the implied covenant of good faith and fair dealing, and violates Arizona common law;

E.    An ~~Order~~order permanently enjoining ~~United HealthCare~~Defendants from paying rates that do not represent usual and customary fees or rates for this locality or alternatively, that do not compensate Providers for the reasonable value of their services; and enjoining ~~United HealthCare~~Defendants from engaging in acts or omissions that are violative of Arizona law;

F.    ~~Their~~Judgment against the RICO Defendants and in favor of Providers pursuant to the Seventh Claim for Relief in an amount constituting treble damages resulting from Defendants' underpayments to Providers for the reasonable value of the emergency services provided to Defendants' Members and reasonable attorneys' fees and costs incurred in bringing this action;

~~F.~~G.    Providers' costs and reasonable attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01;

~~G.~~H.    Pre-judgment and post-judgment interest at the highest rates permitted by law; and

~~H.~~I.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    Providers hereby demand trial by jury on all issues so triable.

2    DATED this ~~10th~~9th day of ~~June~~August, 2019.

3

4                                    By: ~~_____~~
                                         ~~Douglas F. Behm~~
5                                        ~~14362 N Frank Lloyd Wright Blvd, #1000~~
                                         ~~Scottsdale, AZ 85260~~
6                                        ~~Telephone: (480) 477-6700~~
                                         ~~dbehm@behmlaw.com~~
7
                                         ~~Pat Lundvall (NSBN 3761)~~
8                                        ~~Kristen T. Gallagher (NSBN 9561)~~
                                         ~~Amanda M. Perach (NSBN 12399)~~
9    McDONALD CARANO LLP

10                                       ~~2300 West Sahara Avenue, Suite 1200~~
                                         ~~Las Vegas, Nevada 89102~~
11                                       ~~Telephone: (702) 873-4100~~
                                         ~~plundvall@mcdonaldcarano.com~~
12                                       ~~kgallagher@mcdonaldcarano.com~~
                                         ~~aperach@mcdonaldcarano.com~~
13   ~~(~~_____ By: /s/ *Pat Lundvall*

14                                       Pat Lundvall (admitted *pro hac vice* ~~to be~~
     ~~submitted~~)
15                                       Kristen T. Gallagher (admitted *pro hac vice*)
                                         Amanda M. Perach (admitted *pro hac vice*)
16                                       Douglas F. Behm - 014727

17                                       *Attorneys for Plaintiffs*

18        **VERIFICATION PURSUANT TO A.R.S. § 13-2314.04(O)**

19        Under penalties of perjury, the undersigned declares that he is a representative of

20   the Plaintiffs named in the foregoing First Amended Complaint and knows the contents

21   thereof; that the pleading is true of his knowledge, except as to those matters stated on

22   information and belief, and that as to such matters he believes it to be true.

23        Executed: August ___, 2019.

24   _____

25   _____  Kent Bristow

26

27

28                         Page 50 of 51



McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on this 9th day of August 2019, I caused a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** to be served via the U.S. District Court's CM/ECF filing system and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

John C. West, Esq.
Nicole G. True, Esq.
LEWIS ROCA ROTHGERBER CHRISTIE LLP
201 East Washington Street
Suite 1200
Phoenix, AZ  85004
JWest@lrrc.com
NTrue@lrrc.com

*Attorneys for Defendants UnitedHealthcare, Inc.,*
*UnitedHealthcare Services Inc., UMR, Inc.,*
*Unitedhealthcare Integrated Services, Inc., and*
*Unitedhealthcare Specialty Benefits, LLC*

/s/   *Marianne Carter*
An employee of McDonald Carano LLP